IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL DOCKET NO.: 5:12-CV-152

| | |
|---|---|
| TERESA FORD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) FINDINGS OF FACT, CONCLUSIONS |
| | ) OF LAW, and JUDGMENT |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

The present action was filed on October 5, 2014, and brought under the Federal Tort Claims Act against the United States of America for personal injuries Plaintiff Teresa Ford sustained in a motor vehicle collision. 28 U.S.C. §§ 2671-80 ("FTCA") and 28 U.S.C. 1346(b).

The parties stipulated that the cause of the collision was a negligent act or omission by United States Army Corps of Engineers employees acting within the course of their federal employment (Doc. 30, at 4, ¶ 12), and the Court concluded a two-day bench trial on the issues of causation and damages on May 29, 2014. After carefully considering all testimony and arguments presented at trial of this matter, and taking into account the credibility and accuracy of the testimony and other evidence, and studying the applicable law, this Court concludes that Plaintiff is not entitled to judgment.

I.  **FINDINGS OF FACT**

The Court makes the following findings of fact by a preponderance of the evidence and under Rule 52 of the Federal Rules of Civil Procedure.[1]

---

[1] To the extent any findings of fact constitute conclusions of law, they are adopted as such; to the extent any conclusions of law constitute findings of fact, they are so adopted.

1

### A. Parties and Procedural Background

1. Plaintiff Teresa Ford ("Ford") is a citizen and resident of Yadkin County, North Carolina.

2. The United States of America ("Defendant") operates and maintains, through the United States Army Corps of Engineers ("USACE"), the W. Kerr Scott Dam and Reservoir, a man-made lake of the Yadkin River located in Wilkes County, North Carolina. The W. Kerr Scott Dam and Reservoir provides flood control and water supply as well as serving as a park with thirty-two miles of trails, seven boat ramps, and three campgrounds for the public's use and enjoyment.

3. On October 11, 2010, the United States Army Corps of Engineers, Wilmington, North Carolina, received an administrative claim from the Plaintiff. The administrative claim did not include a sum certain amount of damages and was returned to Plaintiff, by letter, dated November 10, 2010.

4. On October 7, 2011, the United States Army Corps of Engineers, Wilmington, North Carolina, received an administrative claim in the amount of $300,000.00 from the Plaintiff. Accompanying the administrative claim were medical records from Salem Neurological Clinic, dated November 11, 2009, July 2, 2010, December 2, 2010, and September 8, 2011, and a letter, dated October 6, 2011 to the United States Army Corps of Engineers signed by Lauren Weinstein.

5. Venue is proper in the United States District Court for the Western District of North Carolina. 28 U.S.C. § 1391.

6. On October 5, 2012, Ford filed this lawsuit.

B. **Factual Background**

7. This lawsuit arises from an automobile accident involving two USACE employees that occurred on October 7, 2009, at the intersection of Ranger Road and New Browns Ford Road, which is also known as Old NC 268, in Wilkesboro, North Carolina.

8. On October 7, 2009, Terry Ramsey was a USACE employee and Operations Manager of the W. Kerr Scott Dam and Reservoir. In that capacity, he hosted a partnership tour in conjunction with the Friends of the Lake of facilities at the W. Kerr Scott Dam and Reservoir.

9. On October 7, 2009, Plaintiff Teresa Ford was employed as the executive director of the Friends of Kerr Scott Lake, a non-profit entity organized and existing under the laws of the state of North Carolina with its principal office in Wilkes County, North Carolina. The purposes of the Friends of W. Kerr Scott Lake was to organize volunteers and to raise funds to develop and maintain projects in and around the W. Kerr Scott Dam and Reservoir and to raise public awareness of activities around the Lake.

10. On October 7, 2009, at approximately 1:10 pm, Operations Manager Terry Ramsey, driving a white 2009 Ford E350 Van, which had been rented from Avis Rental, left the Visitor Center at W. Kerr Scott Dam and Reservoir and proceeded onto Ranger Road. USACE Employee Miriam Fleming followed in a GSA-owned 2007 Dodge Durango. Plaintiff Teresa Ford was sitting in the front seat of the Dodge Durango with her seatbelt on.

11. At approximately 1:15 pm, at the intersection of Ranger Road and New Browns Ford Road (Old NC 268), Operations Manager Ramsey started to turn right and then stopped. The rear end of the 2009 Ford Van and the front end of the Dodge Durango collided in the vicinity of the intersection of Ranger Road and New Browns Ford Road (Old NC 268) in Wilkesboro, North Carolina.

12. Both Operations Manager Terry Ramsey and Miriam Fleming, were USACE employees, acting within the course of their federal employment. The accident was caused by a negligent act or omission of a USACE employee.

13. As a result of the collision, the Dodge Durango which Ms. Ford was riding in was towed from the scene of the collision due to radiator damage. The Ford Van suffered negligible damage to the back bumper and was returned to Avis Rental without incident, even though the collision was disclosed to Avis Rental.

14. After the accident, all of the passengers involved, including Ford, indicated that they were not injured. Ford reported no loss of consciousness, state of confusion, or amnesia as a result of the collision. Ford continued working the day of the accident and continued in her full-time position with Friends of Kerr Scott Lake for two years until funding for her position lapsed in December 2011.

15. Ford first received medical treatment two days after the collision and continued to receive treatment that is discussed below.

    C.    **Ford's Preexisting Medical Conditions and Treatment**

16. On June 4, 2004, six years before the collision, Ford first sought medical treatment from Dr. William Bell for neck pain and a headache. (J.E. 1, at 5-6).

17. On September 21, 2004, Ford sought medical treatment from Dr. Llibre for chronic pain over the neck, shoulder, and arm. (*Id.* at 7).

18. On November 2, 2004, Ford visited Dr. Llibre again for neck pain, shoulder pain, and a headache. (*Id.* at 9).

19. On May 31, 2005, Ford returned to Dr. Llibre and complained of "frequent headaches." (*Id.* at 18).

20. On August, 30, 2005, Ford sought medical treatment again for similar symptoms as before. (*Id.* at 20).

21. On December 6, 28, and 30 of 2005, Ford sought medical treatment for headaches that had lasted a week. (*Id.* at 20-26).

22. On April 13, 2006, Ford visited Dr. Llibre for tension in her neck. (*Id.* at 28-29).

23. On July 20, 2006, Ford visited Dr. Llibre for headaches and left shoulder pain. (*Id.* at 30).

24. On September 16, 2006, Ford visited Dr. Llibre for migraine headaches associated with nausea and vomiting. (*Id.* at 34). The headache was classified as occipital. (*Id.*).

25. On November 18, 2006, Ford visited Dr. Llibre for headache and neck pain. Ford met with Dr. Llibre again on December 14, 2006 for a follow-up appointment. (*Id.* at 37).

26. On March 15, 2007, Ford visited Dr. Llibre in anticipation of her upcoming surgery with Dr. William Bell. Dr. Llibre noted that Ford still complained of neck spasms. (*Id.* at 49).

27. On March 21, 2007, Ford underwent surgery with Dr. Bell where he performed an anterior cervical discectomy and fusion at C5-6. (*Id.* at 52). On April 30, 2007, Dr.

Bell noted that "overall [Ford's] left upper extremity symptoms have resolved with the surgery." (*Id.* at 60.)

28. On June 14, 2007, Ford visited Dr. Llibre for a headache with a follow-up visit on June 16, 2007. Dr. Llibre described the headache as "1 day occipital, dull ache pain is between 7 and 8 on the scale of 10." (*Id.* at 61-63.)

29. On April 21, 2009, Ford visited Dr. Llibre for occipital headaches lasting three days with pain resulting in her neck. This headache was associated with a sensitivity to light and sound. Dr. Llibre assessed her with migraine and cervicalgia. (*Id.* at 91).

30. On August 31, 2009, approximately five weeks before the collision, Ford visited Dr. Edward G. Hill and stated that she had suffered from "migraine-type headaches" for the past nineteen years and that the headaches occurred 4-5 times a month and that three times a month the headaches were so severe that she sought emergency treatment. At this visit, Ford told Dr. Hill that she had trouble sleeping 2-3 times a week, had issues focusing during the day, and also had problems with her memory. Furthermore, Ford told Dr. Hill that that she had started topiramate a few months previous and that is the only medication that seems to be making a difference. Dr. Hill noted that Ford's memory problems were most likely due to her sleep issues and "very severe depression." (*Id.* at 93-94). Dr. Hill assessed Ford with migraines, cervical muscular spasm, and memory loss. (*Id.*).

31. Ford had cervical muscular spasms before the collision. (Tr. 83).

    **D.**    **Ford's Diagnosis and Treatment Following the Collision**

32. Ford did not go to the emergency room after the accident.

33. On October 9, 2009, two days after the collision, Ford visited Dr. Hill. Dr. Hill diagnosed Ford with a soft tissue injury post motor vehicle accident with a flexion and extension event. Dr. Hill also diagnosed Ford with post-concussive muscular contraction headaches.

34. Treatment of Ford's ailments following the collision have included nonnarcotic analgesics, muscle relaxants, physical modalities, nerve root blocks, trigger point injections, Botox injections, and a large amount of medications.

35. On October 9, 2009, Ford had a neck x-ray. (J.E. 1, at 112). On December 31, 2009, Ford had an MRI. (J.E. 1, at 120). Neither showed any evidence of spasm or cervical lordosis. (Tr. 288).

36. On November 11, 2009, Dr. Hill sent a letter to Ford's primary care physician, Dr. Llibre, stating:

> [Ford] continues to have a good deal of postconcussive headache symptoms and, more importantly, whiplash-type discomfort. Thankfully, the cervical spine films confirm that she has stable fusion still at C5-C6. She has gotten a little bit of relief from the Zanaflex and Savella.
>
> As you know, she has a long history of migraines, but her migraines were under good control prior to this accident. The accident has caused her to have a different type of headache pain and cervical pain. Her current complaints must not be confused with her preexisting problems with migraines, with the latter not really being an issue at this time.
>
> (J.E. 1 at 114.)

37. On October 27, 2010, an MRI showed that Ford had developed a loss of normal cervical lordosis, or curvature of the spine. (*Id.* at 142-43.)

38. Ford's condition was deteriorating prior to the accident. This is evidenced by her decision to see a specialist – Dr. Hill – rather than deciding to see Dr. Llibre. The accident did not contribute to the deterioration.

39. Between October 9, 2009, and the time of trial, Ford has incurred medical expenses in the total amount of $102,858.32.

40. As of October 7, 2009, Ford was earning an annual salary of $40,000 in her position as Executive Director of the Friends of W. Kerr Scott Lake. As stated above, Ford continued to work in this position until December 31, 2011.

41. Ford was born on July 7, 1960, her current age is 53, and her life expectancy is a total of 83.1 years.

**E. Expert Testimony**

1. David McCandless, a Professional Engineer with a Masters Degree in Mechanical Engineering, with a minor in Material Science and Advanced Mathematics, from North Carolina State University, testified for Defendant as an expert in mechanical engineering and accident reconstruction based on his twenty-three years of experience. (Tr. at 401). McCandless testified that, based on the damage to the Ford Van and Dodge Durango he viewed in pictures taken, the left front of the Durango struck the right rear of the van. (*Id.* at 410). Based on photos and data surveys, McCandless estimated that the Durango was on a 6 percent downgrade at the intersection while the van had started to travel uphill. (*Id.* at 412-413). McCandless testified that the closing speed of the two vehicles at time of impact was between approximately eight and eleven miles per hour based on

his review of pictures of damage to each vehicle and the fact that air bags did not deploy, coupled with his knowledge and training. (*Id.* at 413-15).

2. Dr. E. Wayne Massey, Professor of Medicine, Department of Neurology, Duke University School of Medicine, testified for Defendant as a neurological expert. Dr. Massey reviewed Ford's medical records from before and after the collision. Dr. Massey came to the conclusion that Ford did not sustain any neurological deficit or new cervical spine injury as a result of the collision. Dr. Massey did not conduct an examination of Ford in person.

3. Dr. Kenneth Cloninger, a Board Certified Neurosurgeon, testified for Defendant as a neurological expert. Dr. Cloninger reviewed Ford's medical records from before and after the collision. Dr. Cloninger came to the conclusion that the collision did not produce a concussion, any problem at all with the cervical spine, torticollis, headaches, or cervical spasm. (*Id.* at 302-303, 282, 287, 303, 303-304).

4. Dr. Hill, as stated above, testified for Ford. Dr. Hill's office saw Ford once before the accident in question. Dr. Hill testified that the collision caused a worsening of Ford's condition. (Tr. 149). Particularly, Dr. Hill testified that Ford's condition was worsened by what he calls a "post-concussive situation." (*Id.*). He stated that Ford's headaches "changed very clearly in nature and developed a cervical component, the neck component, as well as the post-concussive symptoms." (*Id.*).

**F. The Accident Did Not Cause New Injuries**

1. The Court finds that the accident in question did not cause new injuries or otherwise contribute to a worsening of Ford's underlying condition.

9

2. As documented above, Ford had significant pre-existing conditions.
3. The accident in question was minor in nature. The Durango's safety features, namely its plastic and foam components, absorbed much of the impact. This is substantiated by McCandless' opinion as well as lay witnesses who were inside the vehicles involved in the accident. (Tr. 320-21, 380-81, 390-91).
4. Ms. Kerr, a consultant to Friends of the Lake, saw no difference in Ford's behavior or what she was capable of doing pre- and post-accident. (Tr. 360-63). For example, Ford was capable of picking up heavy objects and performing other tasks for the organization. (*Id.*).
5. Dr. Cloninger was more persuasive and credible than Dr. Hill in the context of their respective testimonies and all of the evidence in the case.
    a. Although Dr. Hill came to be a treating physician, for the most part he viewed the same records as Dr. Cloninger regarding Ford's pre-accident condition. Ford's single visit to Dr. Hill prior to the accident did not create the type of lengthy doctor-patient relationship that would enable Dr. Hill to be notably better situated than Dr. Cloninger to evaluate a change in condition.
    b. Dr. Cloninger's testimony regarding objective findings pre- and post-accident was more persuasive than Dr. Hill's, particularly in light of the following:
        i. The lack of objective findings supporting causation;
        ii. The fact that Ford did not have any indicators that she experienced a concussion as a result of the accident. (Tr. 272-74, 302-03).

iii. Dr. Hill did not order a CT scan after the accident, which is what one might have expected had the patient had a concussion. (Tr. 271).

iv. Dr. Hill diagnosed Ford with torticollis on September 18, 2010 (J.E. 1, at 140). Torticollis does not develop months after an accident. (Tr. 287); *see also* (D.E. 22, at 72, 79-81). Epidemiological studies show that in most cases torticollis is not associated with trauma. (D.E. 22, at 79). Accordingly, Ford did not develop torticollis as a result of the accident.

v. The fact that a straightening of the cervical lordosis would not occur months after the accident. (Tr. 288). Accordingly, the straightening in Ford's case was not caused by the accident.

vi. Ford's condition was not meaningfully under control prior to the accident. (Tr. 278-79).[2]

vii. Spurling's sign was absent two days after the accident, (Tr. 269), which indicates that there was no significant compression on the cervical nerves.

viii. Lhermitte's sign was absent two days after the accident, (Tr. 269-70), which indicates that there no spinal cord compression.

ix. Headaches, including occipital headaches, occurred prior to the accident.

x. Neck and shoulder spasms occurred prior to the accident.

---

[2] While Dr. Hill later attempted to explain that "good control is relative," (Tr. 168), the Court still finds that multiple emergency room visits a month does not qualify as a condition that is "manageable," (*Id.*).

    xi. The finding from the x-ray performed on October 10, 2009 indicates no subluxation and extension. (Tr. 275). This indicates that there was no stretching of any ligaments that would allow excessive motion of the neck, (*Id.*), which is contrary to Dr. Hill's assertion of a whiplash type injury.

 6. The accident did not cause the injuries that Ford claims.

## II. CONCLUSIONS OF LAW

1. The United States is the proper defendant in this action under 28 U.S.C. § 1346(b) and the FTCA, 28 U.S.C. § 2671 *et seq.*

2. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1346.

3. Under the FTCA, the United States may be held liable for personal injury caused by the negligent act or omission of employees of the United States acting within the scope of their employment under the same circumstances where the United States, if a private person, could be responsible to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. §§ 1346(b) & 2674. As a waiver of sovereign immunity, the FTCA must be strictly interpreted and applied. *United States v. Sherwood,* 312 U.S. 584, 590, 61 S.Ct. 767, 85 L.Ed. 1058 (1941); *Gould v. U.S. Department of Health & Human Services,* 905 F.2d 738, 741 (4th Cir.1990) (en banc).

4. Under the FTCA, procedural matters are governed by federal law. *Id.* As to substantive legal issues, the FTCA directs the court to look to the laws of the state where the act or omission occurred in order to determine whether a complaint in

negligence warrants relief. *Estate of Purkey ex rel. Purkey v. United States*, 299 F. Supp. 2d 539, 541 (W.D.N.C. 2004) (citing, among others, *FDIC v. Meyer*, 510 U.S. 471, 478 (1994)).

5. In this case, Ford alleges negligence at W. Kerr Scott Dam and Reservoir in Wilkes County, North Carolina. Therefore, North Carolina law governs this action because North Carolina is the site of the alleged tort. 28 U.S.C. § 1346(b).

6. In North Carolina, "[a]ctionable negligence is the failure to exercise that degree of care which a reasonable and prudent person would exercise under similar conditions." *Hart v. Ivey*, 332 N.C. 299, 305, 420 S.E.2d 174, 177-78 (1992). Further, a "defendant is liable for his negligence if the negligence is the proximate cause of injury to a person [as to] whom the defendant is under a duty to use reasonable care." *Id.*

7. "In cases involving complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury. However, when such expert opinion testimony is based merely upon speculation and conjecture, it is not sufficiently reliable to qualify as competent evidence on issues of medical causation. The evidence must be such as to take the case out of the realm of conjecture and remote possibility, that is, there must be sufficient competent evidence tending to show a proximate causal relation." *Holley v. ACTS, Inc.*, 357 N.C. 228, 232, 581 S.E.2d 750, 753 (2003) (internal citations and quotations omitted).

8. The parties have stipulated that the collision on October 7, 2009, was caused by a negligent acts or omissions of USACE employees acting within the scope of their

13

federal employment. (Doc. 30 at 4, ¶ 12). Therefore, this Court has two questions to answer. First, whether any of Ford's subsequent ailments were proximately caused by the collision, and secondly, if there was proximate causation, the amount of damages.

9. The collision did not proximately cause Plaintiff's alleged injuries.

10. Accordingly, Ford may not recover under the FTCA.

## III. Order and Judgment

**IT IS, THEREFORE, ORDERED, ADJUDGED, and DECREED THAT** Ford recover nothing from Defendant.

Signed: May 14, 2015

Richard L. Voorhees
United States District Judge